**Exhibit A**

**AFFIDAVIT OF SPECIAL AGENT MATTHEW J. McCARTHY**

I, Matthew J. McCarthy, being duly sworn, depose and state:

1.      I am a Special Agent of the United States Department of Homeland Security,

Homeland Security Investigations ("HSI"), currently assigned to the Office of the Special Agent

in Charge, Boston, Massachusetts, and have been employed in that capacity for over 16 years.

From May 2004 to December 2010, I was assigned to the Document and Benefit Fraud Task

Force.  From December 2010 until November 2014, I was assigned to the Organized Crime Drug

Enforcement Task Force.  Since November 2014, I have been assigned to the Counter-

Proliferation Investigations Group.  During my career I have been the affiant on numerous

affidavits in support of both search warrants and criminal complaints in the District of

Massachusetts.  I have received specialized training on how to conduct investigations involving

the violation of federal law, most recently, involving the illegal exportation of weapons,

technology, and other controlled commodities and on the federal criminal statutes that regulate

and, in certain instances, prohibit the export of U.S. controlled commodities, including weapons,

weapons systems, military equipment and technology.  I am responsible for investigating and

enforcing violations of the Arms Export Control Act, 22 U.S.C. § 2778, as well as the

International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. §§ 1701 *et seq.*, and

relevant regulations.  I have participated in several investigations of violations of United States

laws relating to the unlawful export from the United States of goods and technology restricted

for export for reasons of national security and foreign policy.

2.      As a Special Agent, I am a Federal Law Enforcement Officer within the meaning

of Rule 41(a) of the Federal Rules of Criminal Procedure, that is, a government agent engaged in

the enforcement of the criminal laws of the United States and thereby authorized to request the issuance of federal seizure warrants.

3.      The information contained in this affidavit is based on witness interviews, conversations with other agents, the review of records, documents and other evidence obtained during this investigation, and my personal knowledge and observations, and my training and experience.

4.      Because this affidavit is submitted for the limited purpose of establishing probable cause for the requested seizure warrant, I have not included each and every fact known to me concerning this investigation.  Rather, I have set forth only those facts that I believe are necessary to establish probable cause to support the warrant requested herein.

## PURPOSE OF AFFIDAVIT

5.      I make this affidavit in support of government's application for the issuance of a seizure warrant for the following property (BUT NOT CONTENT):

   a.   The domain name www.EKT2.com and related email domain @ekt2.com (collectively, the "Subject Domain"), which is registered with Interserver Inc. ("Interserver"), headquartered at 110 Meadowlands Parkway, Secaucus, New Jersey 07094.

6.      The government is seeking only to seize the Subject Domain so that the Subject Domain cannot be used to facilitate export violations.  It is not seeking, at this time, to search or seize any content that may reside on emails or webpages associated with the Subject Domain.

7.      As set forth below, there is probable cause to believe that the Subject Domain is subject to seizure and forfeiture pursuant to 19 U.S.C. § 1595a(d), as "property used to facilitate the exporting or sending of" "[m]erchandise exported or sent from the United States or attempted to be exported or sent from the United States contrary to law."  Specifically, there is probable cause to believe that the Subject Domain has been used to facilitate the export of electronic

components and devices from the United States contrary to law, including but not limited to

violations of 50 U.S.C. § 1705 (IEEPA – conspiracy and substantive violations of U.S. Embargo

against Syria, Blocking Property of Weapons of Mass Destruction Proliferators and their

Supporters, and Export Administration Regulations) and the Export Administration Regulations

("EAR"), 15 C.F.R. §§ 730-744, which control the export and re-export of "dual-use items," that

is, commercial items that also have a military application, to foreign countries.

8.      This Court has authority to issue the requested seizure warrant pursuant to 19

U.S.C. § 1595a(d), 19 U.S.C. § 1603(a), and Federal Rule of Criminal Procedure 41, which

authorizes seizure warrants, upon probable cause, for property subject to forfeiture for violations

of United States customs laws.

9.      The procedure by which the government will seize the Subject Domain are

described in **Attachment A** and below.

## TECHNICAL BACKGROUND

10.     Based on my training and experience and information learned from others, I am

familiar with the following terms:

a.      Internet Protocol Address:  An Internet Protocol address (IP address) is a

unique numeric address used by computers on the Internet.  An IP Address is a series of four

numbers, each in the range 0-255, separated by periods (*e.g.*, 121.56.97.178).  Every computer

attached to the Internet must be assigned an IP address so that Internet traffic sent from and

directed to that computer may be directed properly from its source to its destination.  An IP

address acts much like a home or business street address – it enables computers connected to the

Internet to properly route traffic to each other.  The assignment of IP addresses to computers

connected to the Internet is controlled by ISPs.

b.      <u>Domain Name</u>:  A domain name is a simple, easy-to-remember way for humans to identify computers on the Internet, using a series of characters (*e.g.*, letters, numbers, or other characters) that correspond with a particular IP address.  For example, "usdoj.gov" and "cnn.com" are domain names.

c.      <u>Domain Name System</u>:  The domain name system ("DNS") is, among other things, a hierarchical convention for domain names.  Domain names are composed of one or more parts, or "labels," that are delimited by periods, such as "example.com."  The hierarchy of domains descends from right to left; each label to the left specifies a subdivision, or subdomain, of the domain on the right.  The right-most label conveys the "top-level" domain. For example, the domain name "example.com" means that the computer assigned that name is in the ".com" top-level domain, the "example" second-level domain, and is the web server.

d.      <u>Domain Name Servers</u>:  DNS servers are computers connected to the Internet that convert, or resolve, domain names into Internet Protocol ("IP") addresses.  For each top-level domain (such as ".com"), there is a single company, called a "registry," that determines which second-level domain resolves to which IP address.  For example, the registry for the ".com" and ".net" top-level domains is VeriSign, Inc., which has its headquarters at 21355 Ridgetop Circle, Dulles, Virginia.

e.      <u>Registrar & Registrant</u>:  Domain names may be purchased through a registrar, which acts as the intermediary between the registry and the purchasers of the domain name.  The individual or business that purchases, or registers, a domain name is called a "registrant."  Registrants control the IP address, and thus the computer, to which their domain name resolves.  Thus, a registrant may easily move a domain name to another computer anywhere in the world.  Typically, a registrar will provide a registrant with the ability to change

the IP address to which a particular IP address resolves through an online interface.  Registrars typically maintain customer and billing information about the registrants who used their domain name registration services.

11.     Web hosting companies, such as Interserver, maintain server computers connected to the Internet.  Their customers use those computers to operate websites on the Internet.

12.     Web hosting companies sometimes also provide their customers with email accounts, and the contents of those accounts are also stored on the web hosting company's servers.  Often, when a domain name is part of an email address, that email server is hosted by that said domain server.

13.     Web sites are often known to the outside world by a domain name, such as www.uscourts.gov or www.amazon.com.  Domain names must be registered to particular individuals.  Sometimes, web hosting companies offer customers the separate service of registering domain names.  When that occurs, web hosting companies typically retain information related to the domain name, including the date on which the domain was registered, the domain name itself, contact and billing information for the person or entity who registered the domain, administrative and technical contacts for the domain, and the method of payment tendered to secure and register the domain name.

## STATUTORY AND REGULATORY FRAMEWORK

14.     Based on information and belief, and in consultation with the Assistant United States Attorneys working on this matter, I understand the statutory and regulatory framework applicable to this seizure warrant is as follows:

### A. Forfeiture Statutes

15.     Title 19, United States Code, Section 1595a(d) is a customs statute that sets forth

seizure and forfeiture authority for merchandise exported contrary to law and for property used

to facilitate the illegal exporting or sending of such merchandise.  It states:

> Merchandise exported or sent from the United States or attempted
> to be exported or sent from the United States contrary to law, or
> the proceeds or value thereof, and property used to facilitate the
> exporting or sending of such merchandise, the attempted exporting
> or sending of such merchandise, or the receipt, purchase,
> transportation, concealment, or sale of such merchandise prior to
> exportation shall be seized and forfeited to the United States.

16.     For something to be exported "contrary to law," courts have noted that there need

only be a violation of any law, and that the statute is not limited to violations of customs laws.

*United States v. Any & all Funds on Deposit in Account No. 0139874788, at Regions Bank, held*

*in the name of Efans Trading Corp.*, 2015 WL 247391, *6 (S.D.N.Y. 2015) ("*Efans Trading*

*Corp.*").  In any event, "at most the question this Court must answer is whether 'some nexus

between international commerce ... and the law violated' exists."  *Id.* (quoting *United States v.*

*Davis*, 648 F.3d 84, 90 (2d Cir. 2011)).  For forfeiture actions under 19 U.S.C. § 1595a, "the

burden of proof set forth in 19 U.S.C. § 1615 [probable cause] applies."  *United States v. Davis*,

648 F.3d 84, 96 (2d Cir. 2011).

17.     Under 19 U.S.C. § 1595a(d), facilitating property is not limited to property to

facilitate the actual export, but rather expressly includes "property used to facilitate the ...

*receipt, purchase, transportation, concealment, or sale of such merchandise prior to [illegal]*

*exportation*."  (emphasis added); *see also Efans Trading Corp.*, 2015 WL 247391 at *12

(forfeiting, as facilitating property, a bank account from which funds were transferred to other

bank accounts, which served as a source of funding for the purchase of merchandise exported

contrary to law).  In other forfeiture contexts, "[t]o 'facilitate' the commission of a crime, the

property must make the prohibited conduct 'less difficult or more or less free from obstruction or hindrance.'" *United States v. 434 Main St., Tewksbury, Mass.*, 961 F. Supp. 2d 298, 317 (D. Mass. 2013) (quoting *United States v. Schifferli*, 895 F.2d 987, 990 (4th Cir. 1990) (quoting *United States v. 3639–2nd Street N.E.*, 869 F.2d 1093, 1096 (8th Cir. 1989))).

18.     In addition to 19 U.S.C. § 1595a(d), which specifically references both seizure and forfeiture authority, 19 U.S.C. § 1603(a) provides that "[a]ny property which is subject to forfeiture to the United States for violation of the customs laws … may be seized by the appropriate officer or person upon process issued in the same manner as provided for a search warrant under the Federal Rules of Criminal Procedure.  This authority is in addition to any seizure authority otherwise provided by law."

19.     This Court has jurisdiction to issue the requested warrant because acts and omissions in furtherance of the offenses under investigation occurred within Massachusetts.  28 U.S.C. § 1355(b)(1)(A) (a forfeiture action or proceeding may be brought in "the district court for the district in which any of the acts or omissions giving rise to the forfeiture occurred."); *see also* Fed. R. Crim. P. 41(b)(5)(A).

**B.  Export Statutes and Regulations[1]**

**a.  United States Sanctions Against Syria**

20.     Pursuant to IEEPA, 50 U.S.C. §§ 1701-1707, beginning in 2004, the President of the United States issued a series of Executive Orders prohibiting certain transactions with Syria by U.S. persons or involving U.S. origin goods.  These sanctions were imposed as a result of

---

[1] On August 13, 2018, the President signed into the law the National Defense Authorization Act of 2019, which includes provisions on export controls, entitled the Export Control Reform Act of 2018 ("ECRA"), Pub. L. No. 115-232, tit. 17, subtitle B, 132 Stat. 2208 (2018).  In part, ECRA provides permanent statutory authority for the EAR.  Because the conduct described in this affidavit occurred prior to August 2018, ECRA does not apply.

Syria's sponsorship of international terrorism, active pursuit of weapons of mass destruction and

missile development, continuing occupation of Lebanon, efforts to de-stabilize Iraq and

undermine the reconstruction efforts of the United States and its allies, and human rights abuses.

21.     On August 17, 2011, then President Barak Obama signed Executive Order 13582,

which, among other things, prohibits "the direct or indirect exportation, re-exportation, sale, or

supply of any services to Syria to the United States by a U.S. person, wherever located."  To

implement the restrictions on trade contained in the Executive Orders regarding Syria, including

E.O. 13582, the United States Department of the Treasury, through the office of Foreign Assets

Control ("OFAC"), issued the Syrian Sanctions Regulations ("SSR") (31 C.F.R. Part 542).  The

SSR make clear that Executive Order 13582 prohibits any U.S. person or anyone located in the

United States from providing any "services" to "a person in Syria or the Government of Syria."

*See* 31 C.F.R. § 542.405(a).  OFAC has broadly defined the "services" prohibited under E.O.

13582 to include "legal, accounting, financial, brokering, freight forwarding, transportation,

public relations, or other services."  *See* 31 C.F.R. § 542.405(d).

   **b.  Export Administration Regulations**

22.     The EAR,[2] 15 C.F.R. §§ 730-744, control the export and re-export of "dual-use

items," that is, commercial items that also have a military application, to foreign countries.  The

EAR defines the items that are subject to Commerce controls as including commodities,

software, and technology.  The Department of Commerce ("DOC") promulgates the EAR and

---

[2] Although the Export Administration Act of 1979 ("EAA"), as amended, 50 U.S.C. App. §§ 2401-2420 (1988), expired on August 20, 2001, Executive Order 13222, 66 Fed. Reg. 44025 (August 17, 2001), which has been extended by successive Presidential Notices, the most recent being that of August 15, 2017, 82 Fed. Reg. 39005, has continued the EAR in effect under the IEEPA, 50 U.S.C. §§ 1701-1706.  As noted in note 1, ECRA now provides for permanent statutory authority so there is no longer a need to continue the authority of EAR by Executive Orders.

maintains the Commodity Control List, which specifies the goods and technologies that require export licenses.

23.     The EAR places limitations on the export of those goods and technology that the Secretary of Commerce deems could make a significant contribution to the military potential of other countries, could prove detrimental to the national security of the United States, or are contrary to the foreign policy of the United States.  EAR controls are based not only on the nature of the item but also on its destination, end use, and end user.

24.     Section 734.3 of the EAR provides that, except for certain enumerated categories, such as items exclusively controlled for export and re-export by the Department of State, Department of Energy, the Department of Treasury's Office of Foreign Asset Control, the U.S. Nuclear Regulatory Commission, or the Patent and Trademark Office, all items made, wholly or in part, in the United States, wherever located, are subject to the EAR.

25.     The EAR prohibits any person from exporting or causing the exportation from the United States of a controlled commodity without having first obtained a validated export license from the DOC unless an exception applies.  Under the EAR, "[n]o person may cause or aid, abet, counsel, command, induce, procure, or permit the doing of any act prohibited, or the omission of any act required by the EAA, the EAR, or any other, license or authorization issued thereunder." 15 C.F.R. § 764.2(b).

26.     The EAR also prohibits any person from engaging in any conduct that "is contrary to the EAA, the EAR, or any order, license, or authorization issued thereunder" or conspiring or acting "in concert with one or more persons in any manner or for any purpose to bring about or to do any act that constitutes a violation of the EAA, the EAR, or any order, license or authorization issued thereunder."  15 C.F.R. §§ 764.2(a), 764.2(d).

27.     The EAR further states that "[n]o person may order, buy, remove, conceal, store, use, sell, loan, dispose of, transfer, finance, forward, or otherwise service, in whole or in part any item exported or to be exported from the United States, or that is otherwise subject to the EAR, with knowledge that a violation of the EAA, the EAR, or any other order, license or authorization issued thereunder has occurred, is about to occur or is intended to occur in connection with the item."  15 C.F.R. § 764.2(e).

28.     An export is an actual shipment or transmission of items subject to the EAR out of the United States.  15 C.F.R. § 734.13(a)(1).  A re-export is an actual shipment or transmission of items subject to the EAR from one foreign country to another foreign country. 15 C.F.R. § 734.14(a)(1).  A "transshipment" is a term that is used to describe an export that travels through a second, intermediary country before arriving at its intended, final destination. Such transshipments are treated as exports to the third country because they were never intended to stay in the second country.[3]

29.     At a minimum, for all exports (including exports by U.S. mail) of any commodity valued over $2,500 or for which an export license is required for shipment outside of the United States, the U.S. seller, manufacturer, exporter, or its shipping agent is required to file Electronic Export Information ("EEI") in the Automated Export System ("AES") with the U.S. Government.[4]  *See* 15 C.F.R. § 758.1.  For each export transaction, pursuant to 15 C.F.R. § 30.6,

---

[3] Prior to the 2016 amendments to the EAR, these CFR provisions were contained in 15 C.F.R. § 734.2(b).  *See* 81 Fed. Reg. 35602 (June 3, 2016).

[4] In addition to the above, an exporter must also file EEI for exports in the following situations, which based upon the facts currently known do not appear applicable:  (1) for any exports of items subject to the EAR that are destined to Cuba, Iran, North Korea, Sudan or Syria; (2) for any exports of munitions-related and spacecraft components or radiation-hardened microelectronics falling within the "600 series" Export Control Classification Number ("ECCN") or "9x515" export control, which were previously controlled under the U.S. Munitions List;

the following EEI data is required to be filed in AES: (1) the name and address of the U.S. seller, manufacturer, broker (or ordering party), or exporter who will be receiving the primary benefit, usually monetary, from the transaction; (2) the date of export; (3) the ultimate consignee/end user who is located abroad and will actually be receiving the export shipment; (4) the "country of ultimate destination in which the goods are to be consumed, further processed, stored, or manufactured;" (5) the method of transportation; (6) the commodity classification number and commodity description; (7) the quantity of units being exported; (8) the value of the goods being exported in U.S. dollars, which should be the same as the selling price to the foreign buyer; (9) the identity and address of any intermediary consignee or authorized shipping agent; and (10) if applicable, the export license number, and ECCN or U.S. Munitions List category code.  15 C.F.R. § 30.6.  Lastly, "[a]ll EEI submitted to AES must be complete, correct, and based on personal knowledge of the facts stated or on information furnished by the parties to the export transaction."  15 C.F.R. § 30.3.  Thus, the filer of the EEI – whether it be the U.S. seller, manufacturer, broker, or exporter or its authorized agent – must ensure that all information reported to the government is true, accurate, and complete.  *See* 15 C.F.R. § 758.1(f).

30.     Knowingly providing false or misleading information, or causing such information to be provided, in connection with the preparation and submission of "export control documents," including EEI filings, is a violation of the EAR.  15 C.F.R. § 764.2(g)(1)(ii), IEEPA, and 18 U.S.C. § 1001; *see* 15 C.F.R. § 772.1 (EAR defines an "Export control

---

(3) for any exports under license exception Strategic Trade Authorization; (4) for any exports of items subject to the EAR that will be transshipped through Canada to a third destination where the export would require EEI or an export license if shipped directly to the final destination from the United States; (5) for all items exported under authorization Validated End-User; (6) for all exports of items subject to the EAR where any parties to the transaction are listed on the DOC's Unverified List; and (7) for exports to India involving any items that controlled under any ECCN for reasons of crime control and regional stability.  15 C.F.R. § 758.1(b).

document" to include, among other things, "EEI on the Automated Export System (AES) presented in connection with shipments to any country"). Similarly, concealing information from the DOC or Department of Homeland Security by failing to file EEI in connection with an export also violates the EAR and 18 U.S.C. § 1001(a)(1). *See* 15 C.F.R. § 764.2(g)(1). Further, the EAR specifically states that "[n]o person may fail or refuse to comply with any reporting or recordkeeping requirement of the EAR." *See* 15 C.F.R. § 762.4(i).

31.     Additionally, violation of, or conspiring to violate, any regulation within the EAR is a federal felony punishable by up to twenty years' imprisonment under the criminal provision of IEEPA. *See* 50 U.S.C. § 1705 ("It shall be unlawful for a person to violate, attempt to violate, conspire to violate, or cause a violation of any license, order, regulation, or prohibition issued under this chapter... A person who willfully commits, willfully attempts to commit, or willfully conspires to commit, or aids or abets in the commission of [one of these unlawful acts] ... shall, upon conviction, be fined not more than $1,000,000, or if a natural person, may be imprisoned for not more than twenty years, or both."); Executive Order 13222 (continuing the enforceability of EAR under IEEPA).

## PROBABLE CAUSE FOR SEIZURE AND FORFEITURE

### A.  The Investigation

32.     This seizure warrant application arises from an investigation into the illegal export activity of a Waltham, Massachusetts-based company, Top Tech US, and its owners, Anni Beurklian ("Beurklian") and Antoine Ajaka ("Ajaka"). The investigation revealed that Top Tech US exported items in violation of U.S. law to a Syrian-based company Electronic Katranji Trading ("EKT") and its general manager Amir Katranji ("Katranji"). On March 21, 2018, a Grand Jury in Boston returned an indictment against Top Tech US, Beurklian, Ajaka, and

Katranji (the "Indictment").  *United States v. Ajaka, et al.*, Crim. No. 18-cr-10069.  The

Indictment, which is attached at Exhibit 1, charged the defendants with conspiracy to commit

export violations, in violation of 50 U.S.C. § 1705; conspiracy to defraud the United States, in

violation of 18 U.S.C. § 371; the illegal provision of services to Syria, in violation of 50 U.S.C.

§ 1705; smuggling, in violation of 18 U.S.C. § 554; conspiracy to obstruct justice, in violation of

18 U.S.C. § 371; obstruction of justice, in violation of 18 U.S.C. § 1519; and mail fraud, in

violation of 18 U.S.C. § 1341.

33.     Ajaka's and Beurklian's business, Top Tech US, was based out of their residence,

10 Juniper Hill Rd., Waltham Massachusetts.  The investigation determined that Katranji, on

behalf of EKT, would contact Ajaka and Beurklian in the United States and request that they

purchase electronic devices and computer equipment.  Ajaka and Beurklian would then order the

goods from U.S.-based companies, representing that the goods were for Top Tech US.  The U.S.-

based companies would then ship the goods to Top Tech US in Massachusetts.  Pursuant to

instructions Katranji provided, Beurklian would then, contrary to law, export these items from

Massachusetts to various entities around the world, misidentifying the purchaser or end user and

falsely understating the value of the goods, thus avoiding the triggering of reporting and/or

licensing obligations for exports under U.S. customs laws.

34.     As set forth in the Indictment, there is probable cause to believe that Top Tech

US, its agents Ajaka and Beurklian, Katranji, and EKT have violated federal laws governing

exports, including, but not limited to, supplying U.S. origin goods to EKT using Top Tech US.

As detailed in the Indictment,

a.  Ajaka and Beurklian violated Executive Order 13852 and 31 C.F.R. § 542.405 by providing services and U.S. origin goods to persons and entities located in Syria in violation of 50 U.S.C. § 1705;

b.  Ajaka and Beurklian, Katranji, and EKT conspired to violate the EAR, 15 C.F.R. §§ 730-774, by acting to evade and defeat certain export regulatory controls, including among other things, procuring and shipping U.S. origin items for companies and individuals listed on the DOC's Entity List and intentionally undervaluing and disguising U.S. origin commodities being exported for the purpose of evading the mandatory filing requirement of EEI to the U.S. government in violation of 50 U.S.C. § 1705; and

c.  Ajaka, Beurklian, Top Tech, Katranji, and EKT conspired to defraud the U.S. Government about Top Tech's export and brokering activities by lying to U.S. Customs and Border Protection regarding outgoing shipments that were detained prior to leaving the U.S. border in violation of 50 U.S.C. § 1705 and 18 U.S.C. §§ 371 and 1001(a).

35.  Currently, Katranji, Beurklian and Ajaka are all fugitives, and believed to be outside of the United States, namely in Syria and/or Lebanon.  Beurklian and Ajaka fled the United States while engaged in plea negotiations with the government.  They could not be located, have not been arrested, and have never appeared in the pending criminal case.

**B.  <u>EKT and the Subject Domain</u>**

36.  The Subject Domain was used to facilitate exports in violation of U.S. law, including several charged in the Indictment.

14

37.     Since June 8, 2007, EKT has been on the DOC's Entity List because the U.S.

Government had determined that EKT was involved in "the acquisition or attempted acquisition

of electronic components and devices capable of being used in the construction of Improvised

Electronic Devices ('IEDs')" that may be used against Coalition Forces in Iraq and Afghanistan.

The U.S. Government further concluded that EKT's activities created a risk of diversion of U.S.

commodities for terrorism, weapon proliferation, and activities contrary the U.S. national

security and foreign policy interest.  *See* 73 Fed. Reg. 54499; 74 Fed. Reg. 54499; *see also* 15

C.F.R. § 744, Supplement No. 4 (DOC's Entity List).

38.     Accordingly, since 2007, U.S. laws have prohibited exports to EKT, its aliases,

and Mohammed Katranji (Katranji's father and business associate) unless the exporter/shipper

first obtained a license from DOC.  No export licenses have been granted to export any U.S.

origin goods to EKT and Mohammed Katranji since 2007.[5]

39.     A detailed history of EKT and its subsidiaries was found on the EKT website, at

the Subject Domain, at http://www.ekt2.com/about-us/ekt-history.  It states EKT was founded by

Mohamad Katranji and began using the trade name EKT in 1989.  EKT is managed by Mohamad

Katranji's sons, including Amir Katranji.  The website further states that in "1998 EKT built … a

factory in Hama City – Syria under the name of Katranji for Electronic Industry" and in 2000,

they opened a "bigger showroom located in … Beirut – Lebanon."  Between 2002 and 2014,

---

[5] In July of 2018, OFAC designated EKT, Katranji, Beurklian and Ajaka as Weapons of
Mass Destruction Proliferators pursuant to Executive Order 13382, entitled Blocking Property of
Weapons of Mass Destruction Proliferators and Their Supporters.  Accordingly, it is now illegal
for any U.S. person to do business with them and their property located in the United States has
been blocked.  These designations and sanctions were imposed against EKT, Katranji, Beurklian,
and Ajaka in coordination with similar actions by the French Government based upon evidence
that EKT was involved in the development of chemical weapons used by the Syrian
Government.

several new branches of EKT were opened including Katranji Electronics and Electronic System

Group in Syria, NKTronics (SmartPegasus) in Lebanon, and Al Amir Electronics in Egypt.  The

website also contains a link chart showing that all of these companies are connected to "EKT

Syria."[6]

40.     EKT also represented on its website that EKT has established numerous

subsidiary companies, all of which use the email domain @ekt2.com.  For example, EKT's

website indicates that EKT Katranji Bros is located in Lebanon with an email address of

sales@ekt2.com and Katranji for Electronic Industries is located in Syria and the email address

for its factory for Printed Circuit Board and Electronic Assembly is ameed@ekt2.com.

41.     In April 2017, an HSI agent with whom I work conducted a "ping" to the Subject

Domain which revealed an IP Address.  Using a reverse domain search, the agent learned that the

Subject Domain is hosted by Interserver.  Interserver is headquartered in the United States.  I

have been advised by that agent that Interserver provides website hosting services, via their

virtual servers and can host the email accounts associated with an internet domain name.  On

May 6, 2020, I confirmed that the Subject Domain is still hosted by Interserver in the United

States.

42.     On May 18, 2017, a search warrant for content was executed on Interserver

related to the Subject Domain.  Based on the execution and my review of the search warrant

return, I determined that EKT's managers and employees, including Katranji, have sent emails

using the email domain @ekt2.com.  Furthermore, based upon my review of the search warrant

---

[6] The format of the website has since changed, removing the history of the company; however, screenshots of this information were taken in 2016 and 2017.

returns, I determined that the Subject Domain server hosted by Interserver is the host for email

addresses that use the email domain @ekt2.com.

43.     Katranji often used the email address amir@ekt2.com, which, based upon my

review of the Interserver search warrant returns, I have determined is associated with EKT and

the Subject Domain.  Further, numerous Katranji emails contain a signature line that reveal that

his business address is located in Syria.  For example, I reviewed an email dated November 11,

2014, in which Katranji used a signature line that indicated that he was affiliated with

"Electronic Systems Group, Nasr St., Damascus, Syria."  On an email dated December 23, 2014,

Amir's signature line read "Eng. Amir Katranji, Katranji for Electric Industries, Lahlah Building,

Industrial Zone, Hama, Syria."  I reviewed an email dated February 25, 2017 from

amir@ekt2.com that stated, "these are for our Syrian branch."  Additionally, a telephone roster

was found showing Katranji as the "GM" of EKT associated with the website www.ekt2.com,

the Subject Domain.  Emails dating up until the May 2017 issuance of the search warrant,

continually show that Katranji uses his Subject Domain email address (amir@ekt2.com) to

conduct EKT's business.

**C.  Use of the Subject Domain to Facilitate Export Violations**

44.     Probable cause exists to believe that Katranji and EKT have used the Subject

Domain to facilitate violations of U.S. export laws, and conspiracy to violate export U.S. law,

including 50 U.S.C. § 1705, the IEEPA, specifically conspiracy and substantive violations of the

United States Embargo against Syria and EAR; 50 U.S.C. § 1705 (IEEPA – Blocking Property of

Weapons of Mass Destruction Proliferators and their Supporters, in violation of Executive Order

(E.O.) 13382; and the EAR, 15 C.F.R. §§ 730-774, by acting to evade and defeat certain export

regulatory controls, including among other things, procuring and shipping U.S. origin items for

companies and individuals listed on the DOC's Entity List and intentionally undervaluing and disguising U.S. origin commodities being exported for the purpose of evading the mandatory filing requirement of EEI to the U.S. government in violation of 50 U.S.C. § 1705.

45.     Throughout this investigation, there have been numerous instances in which emails using the Subject Domain (or forwarded emails from the Subject Domain) were used to contact Beurklian and Ajaka in relation to the ongoing conspiracy to violate U.S. laws set forth in the Indictment.  Katranji also forwarded emails from email addresses using the Subject Domain to his Google email account and copied his Google email address on emails he sent using his ekt2.com account.

46.     For instance, on May 30, 2014 and June 5, 2014, Katranji forwarded emails to Beurklian, in Waltham, Massachusetts, with an order for electronic switches and modules that identified the purchaser as "Eng. Mohammed Katranji, General Manager, Katranji Electronics, Damascus - Syria."  These emails originated from Mohammed Katranji using an email associated with the Subject Domain, ektsy@ekt2.com.  The emails were forwarded by Mohammed Katranji to Amir Katranji, at another email address associated with the Subject Domain, amir@ekt2.com.  Finally, these emails were then forwarded to Beurklian from Katranji's Gmail address, amir.katra@gmail.com.  This email thread also identified EKT's website as www.ekt2.com, the Subject Domain.

47.     The above emails, using the Subject Domain, contained an order for 15 RCM Modules and 62 MTG126D Toggle switches.  As shown in the emails, the purchaser of the modules and switches was Mohammed Katranji and EKT.  As noted above, both EKT and Mohammed Katranji were designated on the DOC's Entity List in 2007.  As a result of this designation, no U.S. origin goods could be exported to EKT or Mohammad Katranji without first

obtaining an export license from the DOC and any license application would likely be denied. *See* 15 C.F.R. Part 744, Supplement No. 4 (Entity List designation for EKT and Mohammad Katranji indicates that there was a "Presumption of denial").

48.     Nevertheless, Beurklian fulfilled the orders.  She avoided obtaining a license to export to EKT by indicating, falsely, that the purchaser of the modules was E-Move FZ CO, and shipping the modules to Dubai.  Dubai is a known transshipment point.  She shipped the switches to Polo Trading in Lebanon, a company Katranji founded in 2013 and used as a shell company for EKT.

49.     As such, the shipments violated the EAR, 15 C.F.R. §§ 730-774, including procuring and shipping U.S. origin items for companies and individuals listed on the DOC's Entity List and intentionally undervaluing and disguising U.S. origin commodities being exported for the purpose of evading the mandatory filing requirement of EEI to the U.S. government in violation of 50 U.S.C. § 1705.

50.     Another example took place or about June 9, 2016.  Katranji had had previously tasked Beurklian with the purchase and export of 3D printers and computer equipment.  In connection with this export, on or about June 8, 2016, Katranji advised Beurklian via WhatsApp that they needed to change the name of the end user on the shipping paperwork to "Amirco Electronics" because the previous listed end user had problems in Egypt, and EKT needed to switch the name.  At this same time, Beurklian received an email from Sana Katranji using the email sana@ekt2.com.  In this email, Sana stated, "Concerning this printer, its urgent to change the consignee to AMIRCO ELECTRONICS."  After this email, Beurklian changed the name of the end user, concealing the actual end user's true identity in violation of U.S. export laws.  The address listed for the ultimate consignee on this shipment is the same address for Al Amir

Electronics, which EKT identified as a branch of EKT on its website.  Both Amirco and Al Amir are known to be owned and operated by EKT.

51.      In addition, in connection with this export, Beurklian also prepared shipping paperwork that falsely stated the value of the goods being shipped.  This false paperwork was provided to the freight forwarder.  Top Tech US would often use freight forwarding services to facilitate their exports.  Freight forwarders are companies that are routinely used by businesses and individuals to facilitate shipment of goods, due to their access to various freight and/or cargo shipping options and logistics.  These freight forwarders are also mandated to file EEI's for any shipment over $2,500 in value and to conduct due diligence on the ultimate consignee for the shipments.  Hence, if a freight forwarder is told the contents of a shipment are under $2,500 in value and not going to any country and/or person who would need a license, they would not file an EEI or need to submit for a license to export.  As a result, Top Tech US's freight forwarder failed to file any EEI for this export with the U.S. government as required for the shipment of goods valued in excess of $2,500.

52.      Thus, the export of the 3D printers and computer equipment was contrary to law. There is probable cause to believe that the printers and equipment were destined for EKT, and no U.S. origin goods could be exported to EKT without first obtaining an export license from the Department of Commerce.  In addition, the shipment violated the EAR, 15 C.F.R. §§ 730-774, by failing to follow export regulatory controls.

53.      As set forth in the above examples, in connection with these exports, there is probable cause to believe that the Subject Domain was used "to facilitate the exporting or sending of such merchandise, the attempted exporting or sending of such merchandise, or the receipt, purchase, transportation, concealment, or sale of such merchandise prior to exportation,"

and thus that the Subject Domain is subject to seizure and forfeiture.  *See* 19 U.S.C. § 1595a(d);

19 U.S.C. § 1603(a); 19 U.S.C. § 1615.

**SEIZURE AND FORFEITURE PROCEDURE**

54.    As detailed in Attachment A, upon execution of the seizure warrant, the registry

for the ".com" top-level domain, VeriSign, Inc., 12061 Bluemont Way, Reston, VA 20190 (the

"Subject Registry"), shall be directed to restrain and lock the Subject Domain pending transfer of

all right, title, and interest in the Subject Domain to the United States upon completion of

forfeiture proceedings, to ensure that changes to the Subject Domain cannot be made absent

court order or, if forfeited to the United States, without prior consultation with the HSI.

55.    In addition, upon seizure of the Subject Domain by HSI, VeriSign will be directed

to point the Subject Domain to a particular IP address, which will display a web page notifying

users that the Subject Domain has been seized.  VeriSign also maintains certain records relating

to the owner of each domain name for which it is the top-level registry (the "Domain Name

Records"), including the Subject Domain.  Certain of these records are available to the public

through a "Whois" lookup through a web browser, among other means.  At the time the Subject

Domain is seized, VeriSign will be directed to change the "Technical Contact" and

"Administrative Contact" fields of the Domain Name Records for the Subject Domain to contact

information relating to HSI to reflect the fact that the Subject Domain has been seized; and to

change the name server fields of the Domain Name Records to effect the forgoing changes.  All

other fields will be changed so that they do not reflect any individual or entity.

56.    Upon completion of forfeiture proceedings, all Domain Name Records for the

Subject Domain maintained by VeriSign will be changed to reflect the transfer of ownership to

the U.S. government.

## **CONCLUSION**

57.     Based on the information contained in this affidavit there is probable cause to believe that the Subject Domain, www.ekt2.com and related email domain @ekt2.com, is property that has been used, or was intended to be used to commit or facilitate violations of 50 U.S.C. § 1705 (IEEPA – conspiracy and substantive violations of U.S. Embargo against Syria, Blocking Property of Weapons of Mass Destruction Proliferators and their Supporters, and the EAR, 15 C.F.R. §§ 730-744.  Accordingly, the Subject Domain is subject to seizure and forfeiture pursuant to 19 U.S.C. § 1595a(d) and seizure pursuant to 19 U.S.C. § 1603(a) and Federal Rule of Criminal Procedure 41.

/s/Matthew J. McCarthy
MATTHEW J. MCCARTHY
Special Agent, HSI

Sworn to me and subscribed before me this 12th day of May, 2020 at **11:00 a.m.**

Notice is hereby provided that, pursuant to Federal Rule of Criminal Procedure 4.1, the affiant was sworn and the contents of this affidavit subscribed to by telephone on the date and time indicated above and on the seizure warrant issued by the Court.



HON. MARIANNE B. BOWLER
United States Magistrate Judge

# ATTACHMENT A

## Property to Be Seized

This warrant applies to information associated with www.ekt2.com, including but not limited to the associated email domain @ekt2.com, that is stored at premises owned, maintained, controlled, or operated by Interserver Incorporated, a company headquartered at 110 Meadowlands Parkway, Secaucus, New Jersey 07094. This warrant does not apply to content.

I. **Seizure Procedure**

    A. The seizure warrant will be presented in person or transmitted via facsimile or email to personnel of the domain name registry listed in Section II ("Subject Registry") and the domain name registrars based in the United States listed in Section III ("Subject Registrars"). The Subject Registry will be directed, for the domain names listed in Section IV ("Subject Domain Names") for which it serves as the top-level domain registry, to make any changes necessary to restrain and lock the domain name pending transfer of all rights, title, and interest in the Subject Domain Name to the United States upon completion of forfeiture proceedings.

    B. Upon seizure of the Subject Domain Names, the Subject Registry shall point the Subject Domain Names to the IPR Center's Domain ns1.seizedservers.com (IP address 66.212.148.117) and ns2.seizedservers.com (IP address 66.212.148.118), at which the Government will display a web page with the following notice:

        This domain name has been seized by ICE - Homeland Security Investigations pursuant to a seizure warrant issued by the United States District Court for the District of Massachusetts for its facilitation of illegal exports from the United States in violation 19 U.S.C. § 1595a(d) and 50 U.S.C. § 1705.

        *19 U.S.C. § 1595a(d), - property used to facilitate the exporting or sending of [m]erchandise exported or sent from the United States or attempted to be exported or sent from the United States contrary to law.*

        *50 U.S.C. § 1705 - International Emergency Economic Powers Act – conspiracy and substantive violations of U.S. Embargo against Syria, Blocking Property of Weapons of Mass Destruction Proliferators and their Supporters, and Export Administration Regulations.*

    C. Upon seizure of the Subject Domain Names, the Subject Registry will take all steps necessary to restrain and lock the domain at the registry level to ensure that changes to the subject domain names cannot be made absent a court order or, if forfeited to the

United States government, without prior consultation with United States Immigration and Customs Enforcement.  All name server fields will be changed to reflect: All name server fields will be changed to reflect "ns1.[Subject Domain Name]" and "ns2.[Subject Domain Name]" i.e:

       a.   "ns1.ekt2.com" and/or "ns2.ekt2.com"

D.  Upon seizure of the Subject Domain Names, the <u>Subject Registrars</u> based in the United States shall contact the registrant of the Subject Domain Name and provide them notice of the seizure along with the following contact information:

| | | |
|---|---|---|
| (a) | Name: | Homeland Security Investigations |
| | | National Intellectual Property Rights Coordination Center |
| (b) | Address: | 2451 Crystal Drive, Suite 200 |
| | | Arlington, VA 20598-5105 |
| | Country: | USA |
| (c) | Telephone: | 1-866-IPR-2060 (477-2060) |
| (d) | Email: | IPRCenter@dhs.gov |
| (e) | Fax: | 703-603-3872 |

## II.    <u>Subject Registry</u>

VeriSign, Inc.
12061 Bluemont Way
Reston, VA 20190

## III.    <u>Subject Registrars based in the U.S.</u>

Interserver Inc.
110 Meadowlands Parkway
Secaucus, New Jersey 07094.

## IV.    <u>Subject Domain Name</u>

      a.   www.ekt2.com and related email domain/service

# EXHIBIT ONE

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA, | Crim. No. 18cr 10069 |
| v. | Violations: |
| | **50 U.S.C. §1705 - Conspiracy to** |
| ANTOINE AJAKA (1), | **Commit Export Violations;** |
| a/k/a TONY AJAKA, | **18 U.S.C. § 371 - Conspiracy to** |
| | **Defraud the United States;** |
| ANNI BEURKLIAN (2), | **50 U.S.C. § 1705 – Illegal Provision of** |
| a/k/a ANNI AJAKA, | **Services to Syria;** |
| | **18 U.S.C. § 554 – Smuggling;** |
| TOP TECH US, INC., (3), and | **18 U.S.C. § 371 – Conspiracy to** |
| | **Obstruct Justice;** |
| AMIR KATRANJI (4), | **18 U.S.C. § 1519 – Obstruction of** |
| a/k/a AMIR HACHEM KATRANJI, | **Justice;** |
| a/k/a AMIR HACHEM ALKATRANJI, | **18 U.S.C. § 1341 – Mail Fraud; and** |
| a/k/a AMIR KATRA. | **18 U.S.C. § 981 and 28 U.S.C. § 2461** |
| | **– Criminal Forfeiture.** |
| Defendants. | |

INDICTMENT

The Grand Jury charges that:

INTRODUCTORY ALLEGATIONS

**A.** **Defendants and Related Entities**

1.    ANTOINE AJAKA ("AJAKA") is a Lebanese national who became a lawful

permanent resident ("LPR") of the United States in 2012. At all times material to this

Indictment, AJAKA and his wife, ANNI BEURKLIAN, a/k/a ANNI AJAKA ("BEURKLIAN"),

also a Lebanese national, lived and worked in Waltham, Massachusetts. BEURKLIAN became a

naturalized U.S. citizen in 2010 and then petitioned for AJAKA to enter the United States as a

LPR.

2.    From a date unknown but no later than 2012 and continuing to the present,

1

AJAKA owned and controlled two companies: TOP TECH US, INC. ("TOP TECH US") and

Top Technologies SARL. TOP TECH US, formerly known as Right Deal Instruments and

Provisions, Inc., was incorporated in the Commonwealth of Massachusetts on December 19,

2012 as a seller and distributor of U.S. origin electronic parts and components. At all times

material to this Indictment, AJAKA was the President of TOP TECH US and BEURKLIAN

served as its Treasurer, Secretary, and Director. They operated TOP TECH US out of their

residence located in Waltham, Massachusetts until on or about January 9, 2018 when they fled

the United States to avoid prosecution. Top Technologies SARL, AJAKA's other company,

which is located in Lebanon, specializes in the import, export, and sale of network and electronic

components.

3.      On or about December 6, 2016, AJAKA and BEURKLIAN began operating TOP

TECH US under a new company name, Tech Zone. AJAKA and BEURKLIAN created this new

company for the purpose of concealing their shipments overseas from the United States

Government after two of TOP TECH US's international shipments had been detained and later

seized by U.S. Government officials before exiting the U.S. border.

4.      AMIR KATRANJI, a/k/a AMIR HACHEM KATRANJI, a/k/a AMIR HACHEM

ALKATRANJI, a/k/a AMIR KATRA ("KATRANJI") is a citizen of Syria who operates and

manages EKT Electronics ("EKT"), a company headquartered in Syria with offices in Lebanon.

EKT is a supplier of communication equipment, electronic components, accessories, and testing

equipment. EKT was founded by KATRANJI's father, Mohammed Katranji, in 1969.

KATRANJI also operates and manages EKT's subsidiaries and affiliated businesses in Syria and

Lebanon, including "Polo Trading."

2

5.      On June 8, 2007 (and reaffirmed in a rule published on September 22, 2008), the

United States Government added EKT and its founder, Mohammed Katranji, to the Department

of Commerce ("DOC") Entity List because it had determined that EKT was involved in "the

acquisition or attempted acquisition of electronic components and devices capable of being used

in the construction of Improvised Explosive Devices ("IEDs"). These commodities have been

and may continue to be, employed in IEDs or other explosive devices used against Coalition

Forces in Iraq and Afghanistan." The U.S. Government further concluded that EKT's activities

created a risk of diversion of U.S. commodities for terrorism, weapon proliferation, and activities

contrary to U.S. national security and foreign policy interest. As a result, the United States

Government placed EKT and all of its known aliases -- Katranji Electronics, Katranji Trading,

Katranji Labs, and Electronics Systems with addresses in both Lebanon and Syria -- and

Mohammed Katranji on the Entity List. *See* 73 Fed. Reg. 54499; 74 Fed. Reg. 54499; *see also*

15 C.F.R. § 744, Supplement No. 4 (U.S. Entity List). Accordingly, since 2007, U.S. law

prohibited exports to EKT, its aliases, and Mohammed Katranji unless the exporter/shipper first

obtained an export license from DOC. Further, no export licenses have been granted to export

any U.S. origin goods to EKT and Mohammed Katranji since that time.

### B.      The U.S. Sanctions Against Syria

6.      Pursuant to the International Emergency Economic Powers Act ("IEEPA"), 50

U.S.C. §§ 1701-1707, beginning in 2004, the President of the United States has issued a series of

Executive Orders prohibiting certain transactions with Syria by U.S. persons or involving U.S.

origin goods. These sanctions were imposed as a result of Syria's sponsorship of international

terrorism, active pursuit of weapons of mass destruction and missile development, continuing

3

occupation of Lebanon, efforts to de-stabilize Iraq and undermine the reconstruction efforts of the United States and its allies, and human rights abuses.

7.    On August 17, 2011, then President Barak Obama signed Executive Order 13582, which, among other things, prohibits "the direct or indirect exportation, re-exportation, sale, or supply of any services to Syria from the United States or by a U.S. person, wherever located." To implement the restrictions on trade contained in the Executive Orders regarding Syria, including E.O. 13582, the United States Department of the Treasury, through the Office of Foreign Assets Control ("OFAC"), issued the Syrian Sanctions Regulations ("SSR") (31 C.F.R. Part 542). The SSR make clear that Executive Order 13582 prohibits any U.S. person or anyone located in the United States from providing any "services" to "a person in Syria or the Government of Syria." *See* 31 C.F.R. § 542.405(a).  OFAC has broadly defined the "services" prohibited under E.O. 13582 to include "legal, accounting, financial, brokering, freight forwarding, transportation, public relations, or other services." *See* 31 C.F.R. § 542.405(d).

8.    At no time did the defendants AJAKA, BEURKLIAN, TOP TECH US, KATRANJI, or anyone associated with Top Technologies SARL or EKT, either individually or through TOP TECH US, apply for or obtain an export license from either the Department of Commerce or the Department of Treasury, OFAC, authorizing the export of U.S. goods to EKT (including any its subsidiaries or corporate aliases) or to Syria.

C.    **Filing Requirements for Exports**

9.    The Department of Commerce requires the filing of electronic export information ("EEI"), previously Shipper's Export Declaration forms ("SEDs"), in the Automated Export System ("AES") for exports of any commodity valued over $2,500 or for which an export license

4

is required for shipment outside of the United States (with exceptions not relevant to the exports at issue in this Indictment). The purpose of this filing requirement is to "strengthen the U.S. government's ability to prevent the export of certain items to unauthorized destinations and/or end users because AES aids in targeting, identifying, and when necessary confiscating suspicious or illegal shipments prior to exportation." 15 C.F.R. § 30.1(b).

10.     For each export transaction, pursuant to 15 C.F.R. § 30.6, the following information, among other things, is required to be filed in AES: the names and addresses of the parties to the transaction; the description, quantity, and value of the items exported; the ultimate consignee (end user); and the ultimate country of destination. Knowingly providing false and misleading information, or causing such information to be provided, in connection with the preparation and submission of "export control documents," including EEI filings, is a violation of the Export Administration Regulations ("EAR"), 15 C.F.R. § 764.2(g)(1)(ii). Similarly, concealing information from the Department of Commerce or the U.S. Customs Service by failing to file EEI in connection with an export also violates the EAR. *See* 15 C.F.R. § 764.2(g)(1).

**D.**     **The Illegal Scheme to Defraud U.S. Government and Violate Export Laws**

11.     In or about 2013, AJAKA and BEURKLIAN began doing business with KATRANJI and supplying U.S. origin goods to EKT using TOP TECH US. AJAKA and BEURKLIAN knew that KATRANJI operated a business in Syria and that they were providing brokering services to KATRANJI and his Syrian company, EKT, by buying and shipping U.S. origin goods to EKT and its customers. EKT paid AJAKA and BEURKLIAN in excess of $200,000 through TOP TECH US's bank accounts for their services. To conceal their illegal

5

activity with EKT and eliminate the EEI filing requirement, with the knowledge and agreement of KATRANJI, AJAKA and BEURKLIAN falsified shipping paperwork and undervalued goods being shipped overseas directly to, or on behalf of, EKT.

12.     On or about August 29, 2016, officers of U.S. Customs and Border Protection ("CBP") assigned to John Fitzgerald Kennedy Airport in New York detained four packages being exported from the United States by TOP TECH US.  These packages contained 1,000 electronic switches (500 Toggle Switches Model No. 8810K15 and 500 Toggle Switches Model No. 8822K20) that had a value of $13,750.  Yet TOP TECH US had told its freight forwarder that the parts were valued at less than $2,500 to avoid having to file EEI related to this export. On or about November 9, 2016, CBP's Office of Fines, Penalties, and Forfeiture sent a letter to TOP TECH US notifying it that the 1,000 switches it had attempted to export had been seized for undervaluing the items being shipped and failing to file the mandatory EEI in AES.

13.     In response to this seizure notice, on or about November 28, 2016, BEURKLIAN sent a letter to CBP in which she made numerous false statements to explain the failure of TOP TECH US to file EEI and claimed that TOP TECH US only charged their client (KATRANJI) $1,000 for the switches.  To support her claim, BEURKLIAN submitted fraudulent documents to CBP, namely, e-mails that BEURKLIAN had altered from their original form and content as well as other e-mails that she had entirely manufactured and created wholesale but had not in fact been sent or received via e-mail between BEURKLIAN and KATRANJI.  BEURKLIAN altered and falsified these records with the intent to impede, obstruct, and influence CBP's investigation of TOP TECH US's exports and EEI filing history, in violation of 18 U.S.C. § 1519.

6

E.    **Flight to Avoid Prosecution and False Statements**

14.    Beginning on or about January 3, 2018, AJAKA and BEURKLIAN engaged in pre-indictment plea negotiations with the Government through their counsel. On or about January 9, 2018, AJAKA and BEURKLIAN fled the United States by driving to Canada with $28,000 in cash and numerous electronic devices (including two laptop computer wrapped in aluminum foil). At the Canadian border, AJAKA and BEURKLIAN informed the Canadian authorities that they intended to stay in Canada for one week and then travel to Lebanon.

15.    On or about January 31, 2018, federal law enforcement agents went to the Waltham, Massachusetts residence of AJAKA and BEURKLIAN to ascertain their whereabouts. When they rang the doorbell, BEURKLIAN, apparently using internet based security equipment, orally responded to the agents. The agents identified themselves to BEURKLIAN, whom they had previously met, and asked her whether she and "Tony" were home. BEURKLIAN responded that "Tony is not home" and that she "[was] at the gym." BEURKLIAN further informed the agents that she wouldn't be home from the gym until that "evening." When the agents inquired whether BEURKLIAN would be at the gym the entire day, BEURKLIAN stopped speaking to the agents. These statements were designed to mislead the federal agents about the whereabouts of AJAKA and BEURKLIAN and conceal the fact that AJAKA and BEURKLIAN had fled the United States and traveled to Lebanon after learning that the Government had uncovered evidence of numerous export violations for which they faced a significant sentence of imprisonment.

7

<u>**COUNT 1:**</u>          **(50 U.S.C. § 1705 – Conspiracy to Commit Export Violations)**

The Grand Jury charges that:

16.     The allegations contained in paragraphs 1-15 are hereby re-alleged and
incorporated by reference as if fully set forth herein.

17.     From a date unknown to the Grand Jury, but no later than in or about February
2013, and continuing thereafter until in or about May 2017, in the District of Massachusetts and
elsewhere,

**ANTOINE AJAKA (1),**
**a/k/a TONY AJAKA,**
**ANNI BEURKLIAN (2),**
**a/k/a ANNI AJAKA,**
**TOP TECH US, INC. (3), and**
**AMIR KATRANJI (4),**
**a/k/a AMIR HACHEM KATRANJI,**
**a/k/a AMIR HACHEM ALKATRANJI,**
**a/k/a AMIR KATRA,**

defendants herein, did knowingly and willfully conspire, combine, confederate and agree with
one another and with other persons known and unknown to the Grand Jury to (1) procure and
export items from the United States for companies and individuals listed on the Department of
Commerce's Entity List, namely EKT and associated entities; and (2) export items from the
United States without filing Shipper's Export Declarations and Electronic Export Information
through the Automated Export System, in violation of 50 U.S.C. §1705, Executive Order 13222,
and 15 C.F.R. §§ 736.2(b)(5), 758.1, 764.2, 744.16 and Supplement No. 4 (the Entity List).

MANNER AND MEANS

The manner and means by which the conspiracy was sought to be accomplished included,
among other things, the following during the dates of the alleged conspiracy:

8

18. The defendants and their co-conspirators used e-mail accounts and other forms of communication to communicate with each other between the United States, Syria, and Lebanon. Several of the foreign co-conspirators used e-mail accounts that contained EKT's name in the domain name.

19. KATRANJI caused his co-defendants AJAKA, BEURKLIAN, and TOP TECH US to purchase items from U.S. suppliers for export overseas to EKT.

20. To obtain items and export them from the United States, defendants AJAKA, BEURKLIAN, and TOP TECH US made false statements to suppliers and shipping companies about the value, description, and ultimate end-user and country of destination for the goods being purchased and exported from the United States. In particular, the defendants AJAKA, BEURKLIAN, and TOP TECH US provided false and misleading invoices to its shipping companies that undervalued and mislabeled the U.S. origin goods being shipped and listed false purchasers and end-users of the goods. In addition, the true destination of some of the U.S. origin goods was concealed by transshipping the goods from the United States to the United Arab Emirates, Egypt, Hong Kong, and Lebanon.

21. Further, it was part of the conspiracy that the defendants AJAKA, BEURKLIAN, and TOP TECH US caused shipping companies in the United States to violate the EAR by unwittingly shipping goods, valued at more than $2,500, to EKT and its subsidiaries, without filing the required EEI or obtaining the necessary export licenses. *See* 15 C.F.R. § 758.1.

9

## OVERT ACTS

22.     In furtherance of the conspiracy, and to effect the objects thereof, the defendants

and their co-conspirators, committed and caused to be committed overt acts within the District of

Massachusetts and elsewhere, including, but not limited to, the following:

a.  On or about October 2, 2013, KATRANJI created a new company -- "Polo Trading"

-- because it would make exporting items from the United States easier.

b.  In or about February 2014, BEURKLIAN exchanged e-mails with AJAKA and

KATRANJI regarding the purchase of electronic testing equipment that TOP TECH US intended

to export overseas for KATRANJI. BEURKLIAN informed KATRANJI and AJAKA that the

U.S. company had asked her to identify the end-user for the requested oscilloscopes.

BEURKLIAN asked KATRANJI and AJAKA via e-mail: "What should I reply to this? If I say

no, he will ask who's the customer, just like the others did? Any suggestions?" In response, on

or about February 10, 2014, KATRANJI instructed BEURKLIAN: "you can reply, that you are a

trading company and have a good PR with local and international customers."

c.  On or about February 20, 2014, BEURKLIAN purchased electronic testing

equipment ("Fluke products") from a U.S. company, which had a value of more than $8,000, for

KATRANJI.

d.  On or about March 6, 2014, BEURKLIAN advised KATRANJI via e-mail that in

order to ship him the Fluke products using Federal Express they would have to undervalue the

goods to avoid filing any paperwork with the Government. She wrote:

> Concerning the package, we went to Fedex to send it. Anything $2500 & above,
> they need formalities and certificate of origin to be filled with details. Tony
> [AJAKA] is suggesting we make the value $2480 so that we don't go through all

10

this procedure avoiding formality papers and time.  Can you pls reply if this is okay with you?

e.  On or about March 8, 2014, BEURKLIAN caused the Fluke products to be exported from the United States without filing any EEI associated with this shipment.  As directed by KATRANJI, the parts worth more than $8,000 were sent by BEURKLIAN via Federal Express from Massachusetts to Amirco Electronics, which is located at the same address as Al Amir Electronics, the Egyptian branch office of EKT.

f.  On May 30, 2014, KATRANJI sent an e-mail to BEURKLIAN requesting that she place an order for Alcoswitch toggle switches bearing part number MTG12 ("MTG12 Toggle Switches") for EKT.

g.  On or about June 4, 2014, BEURKLIAN ordered the MTG12 toggle switches from a U.S. company knowing they were intended for EKT Syria and sent an e-mail to KATRANJI confirming that she was able to order 124 of the MTG12 Toggle Switches.  On or about June 9, 2014, BEURKLIAN sent KATRANJI an e-mail indicating that she had shipped the MTG12 switches to him using United Parcel Service.

h.  On or about July 12, 2014, BEURKLIAN placed an order with a U.S. company for computer parts, namely 15 Rabbit Core Programmable Modules ("RCM Modules"), knowing that the purchaser of the parts was Mohammad Katranji at EKT in Syria.  Both Mohammad Katranji and EKT Syria were then listed on the Department of Commerce's Entity List.

i.  On or about July 12, 2014, KATRANJI instructed BEURKLIAN via e-mail to ship the RCM Modules and other electronic components to Dubai, United Arab Emirates, and to undervalue the parts on the shipping paperwork.

11

j.  On or about July 15, 2014, BEURKLIAN advised KATRANJI via e-mail that the U.S. supplier required an end-user certificate to be completed for the sale of the RCM Modules because "they need to know the end user of this product and final destination." In this e-mail, BEURKLIAN asked KATRANJI: "Should I mention Dubai?" In response, KATRANJI instructed BEURKLIAN to indicate that the parts were going to "China."

k.  On or about July 14, 2014, BEURKLIAN falsely completed the end-user certificate for the RCM Modules by indicating that the end-user was "TOP TECH US, INC." and submitted this form to the U.S. supplier to fraudulently obtain the parts ordered by EKT in Syria.

l.  On or about July 17, 2014, BEURKLIAN shipped the RCM Modules and other electronic components to Dubai via United Parcel Service as KATRANJI had instructed and caused these parts to be exported from the United States. The value of these parts was in excess of $2,500 and BEURLIAN knew they were intended for EKT in Syria yet she failed to file EEI or obtain an export license for this shipment.

m.  On or about December 10, 2014, BEURKLIAN sent an e-mail to KATRANJI advising him that she had received three items -- electronic components and testing equipment, valued at more than $2,500 -- that TOP TECH US had purchased on his behalf from US companies. In this e-mail, BEURKLIAN further asked KATRANJI, "Can you pls give me price and description for customs invoice?" In response, KATRANJI instructed BEURKLIAN to undervalue the parts by more than $2,000.

n.  On or about March 6, 2015, TOP TECH US caused EEI to be filed with the United

12

States Government related to an export of $11,382.70 of electronic and sound equipment that falsely identified the end-user as Top Technologies SARL in Lebanon, when in fact the end-users were KATRANJI and EKT.

o.   On or about August 8, 2015, BEURKLIAN caused 900 Toggle Switches (400 Model No. 8822K20 and 500 Model No. 8810K15) to be exported from United States to Dubai, United Arab Emirates, using the U.S. Postal Service for the benefit of KATRANJI and EKT. In relation to this export, BEURKLIAN falsely valued the contents of the shipment at $900 when the parts were actually valued at $13,507. BEURKLIAN also failed to file any EEI for this export with the U.S. Government.

p.   On or about November 18, 2015, BEURKLIAN sent an e-mail to KATRANJI in relation to an upcoming export of 900 Toggle Switches Model No. 8824K14 for which TOP TECH US had been charged $15,372 by a U.S. supplier. In her e-mail, BEURKLIAN advised KATRANJI that she was going to make the value of the goods "$270" for the "customs invoice & Packing list" because that "doesn't need extra papers to be filled [sic]."

q.   On or about February 1, 2016, KATRANJI sent BEURKLIAN an e-mail entitled "New Inquiry for Switches" informing her that EKT had a "new order for switches" and requesting that she obtain quotations for three models of switches – 500 model #8822K20 switches, 500 model #8810K15 switches, and 1,950 model #8868K5 switches (collectively the "K Model Toggle Switches"). These K Model Toggle Switches each have a variety of military applications.

r.   On or about May 8, 2016, KATRANJI sent BEURKLIAN an e-mail advising her that

13

the K Model Toggle Switches "should be shipped to Hong Kong" for assembly "in China with other items."

s. On or about May 12, 2016, TOP TECH US placed a purchase order for 2,950 Toggle Switches (Model nos. 8822K20, 8810K15, and 8868K5) for a total price of $54,896.50 with a U.S. company knowing that these switches were being purchased by EKT.

t. On or about May 13, 2016, BEURKLIAN paid the U.S. company a deposit of approximately $41,000 in relation to the purchase order for EKT's K Model Toggle Switches.

u. On or about June 9, 2016, BEURKLIAN caused 3D printers and computer equipment to be exported from the United States to Egypt by falsely identifying the end-user. In relation to this export, one day earlier, on or about June 8, 2016, KATRANJI had advised BEURKLIAN via Whatsapp that they needed to change the name of the end-user on the shipping paperwork to "Amirco Electronics" because they had previously had trouble with shipping parts into Egypt. BEURKLIAN agreed to use a different name on the shipping paperwork. Additionally, BEURKLIAN prepared false shipping paperwork undervaluing the goods being shipped, which was provided to the freight forwarder. As a result, TOP TECH US caused the freight forwarder not to file any EEI with the U.S. Government even though the value of the goods shipped was in excess of $4,700.

v. On or about August 6, 2016, BEURKLIAN sent KATRANJI an e-mail in relation to EKT's order of the 2,950 K Model Toggle Switches in which she asked KATRANJI for the "consignee name and address" and asked him to "tell" her if she needed "to change the description and price" on the shipment paperwork. In response, KATRANJI instructed

14

BEURKLIAN to describe the parts as switches having a value of $1 each.  KATRANJI also

instructed BEURKLIAN to ship the parts to "Chow Sau Ha" located in Hong Kong.

w.  On or about August 25, 2016, BEURKLIAN caused 1,000 of the K Model Toggle

Switches (500 model no. 8810K15 switches and 500 model no. 8822K20 switches) to be shipped

from the United States to Hong Kong with the intent to re-export these items to EKT.  These

parts, however, were detained by U.S. Customs and Border Protection at the JFK Airport in New

York prior to be exported from the United States.  In relation to this export, TOP TECH US had

falsely identified the end-user and value of the parts to its freight forwarder.  BEURKLIAN had

prepared a TOP TECH US commercial invoice, which it provided to its freight forwarder, that

falsely identified the value of each of the 1,000 switches as $1 for a total value of $1,000, when

in fact the value of the shipment was in excess of $13,000.

x.  On or about September 4, 2016, KATRANJI sent an e-mail to BEURKLIAN

instructing her to change the description of the goods and not to mention the part numbers in the

shipping paperwork for an export of audio frequency amplifiers, valued at approximately $8,000.

y.  On or about November 30, 2016, BEURKLIAN sent a letter to CBP requesting the

return of the 1000 K Model Toggle Switches, which had been detained at the JFK Airport in

New York in August 2016.  In this letter, BEURKLIAN made numerous false statements in an

effort to conceal TOP TECH US's numerous violations of the EAR from the Government.

Among other things, BEURKLIAN stated in her letter to CBP that: TOP TECH US was a new

company and was not aware that the EEI reporting requirements applied to the "real value" of

the parts being exported; TOP TECH US had agreed to sell the switches to its customer for only

$1.00 each; and any mistake made on the shipping paperwork was unintentional.

z.  On December 5, 2016, after CBP detained a second TOP TECH US international shipment, BEURKLIAN sent an e-mail to AJAKA stating that they needed to "open a new company asap."

aa.  On or about December 6, 2016, BEURKLIAN incorporated a company named "Tech Zone" for the stated purpose of "import/export sales of durable goods."  This was the same purpose for which TOP TECH US was purportedly established according to its Articles of Organization.  In addition, the business address for Tech Zone was the same as TOP TECH US - - 10 Juniper Hill Road, Waltham, Massachusetts.

bb. On or about December 9, 2016, BEURKLIAN advised KATRANJI that she was shipping items to "Top Technologies Lebanon" for him and that once the parts arrived in Lebanon, "Tony" will give them to "you."  BEURKLIAN further requested in her e-mail that KATRANJI pay AJAKA "35,154.61" for the items and indicated that "Tony [would then] transfer [the money] to me … so that I can make my payments here [that is, in Massachusetts]."

cc. On or about December 13, 2016, BEURKLIAN caused U.S. origin goods to be exported from the United States to Top Technologies SARL in Lebanon.  BEURKLIAN further caused false EEI to be filed with the Government regarding this export, which falsely identified the end-user of these goods as Top Technologies SARL in Lebanon when in fact BEURKLIAN knew the end-user for the majority of these goods was indeed KATRANJI and EKT.

dd. On or about December 14, 2016 through December 19, 2016, AJAKA confirmed with BEURKLIAN via Whatsapp that all of the items had been received in Lebanon for "Amir" or words to that effect.

ee. On or about February 18, 2017, BEURKLIAN told KATRANJI that a lawyer told

16

AJAKA and BEURKLIAN that they needed to "go easy on export[ing] until the problem" was resolved but BEURKLIAN told KATRANJI that they (AJAKA and BEURKLIAN) could still ship computers and electronics to their company in Lebanon, Top Technologies SARL, for him.

All in violation of 50 U.S.C. § 1705 and 18 U.S.C. § 2.

17

**COUNT 2:**          **(18 U.S.C. § 371 – Conspiracy to Defraud the United States)**

The Grand Jury charges that:

23.     The allegations contained in paragraphs 1-15 and 18-22 are hereby re-alleged and incorporated by reference as if fully set forth herein.

24.     From a date unknown to the Grand Jury, but no later than in or about February 2013, and continuing thereafter until in or about May 2017, in the District of Massachusetts and elsewhere,

**ANTOINE AJAKA (1),**
**a/k/a TONY AJAKA,**
**ANNI BEURKLIAN (2),**
**a/k/a ANNI AJAKA,**
**TOP TECH US, INC. (3), and**
**AMIR KATRANJI (4),**
**a/k/a AMIR HACHEM KATRANJI,**
**a/k/a AMIR HACHEM ALKATRANJI,**
**a/k/a AMIR KATRA,**

defendants herein, did knowingly and willfully conspire, combine, confederate and agree with one another and with other persons known and unknown to the Grand Jury to defraud the United States by impeding, obstructing, and interfering with the lawful government functions of various federal agencies, including the Department of Commerce and the Department of Homeland Security, in the ascertainment and collection of customs and export information and the exercise of authority to inspect and examine cargo crossing the United States border, through deceitful, improper, unlawful, and dishonest means, to wit: knowingly failing to file export information in the form of SEDs and EEI, and knowingly filing and causing the filing of false and misleading EEI with the U.S. Government, and one or more co-conspirators did one or more acts to effect

18

the object of the conspiracy as described in paragraphs 22 (a-cc).

All in violation of 18 U.S.C. § 371.

**COUNT 3:**       **(50 U.S.C. §1705 – Illegal Provision of Services to Syria)**

The Grand Jury charges that:

25.     The allegations contained in paragraphs 1-15 are hereby re-alleged and incorporated by reference as if fully set forth herein.

26.     From a date unknown to the Grand Jury, but no later than in or about February 2013, and continuing thereafter until in or about May 2017, in the District of Massachusetts and elsewhere,

**ANTOINE AJAKA,**
**a/k/a TONY AJAKA;**
**ANNI BEURKLIAN,**
**a/k/a ANNIE AJAKA; and**
**TOP TECH US, INC.;**

defendants herein, did knowingly and willfully provide services to a person located in Syria, to wit: brokering, purchasing, and supplying U.S. origin goods to AMIR KATRANJI, a/k/a AMIR HACHEM KATRANJI, a/k/a AMIR HACHEM ALKATRANJI, a/k/a AMIR KATRA and EKT, a company headquartered in Syria, in violation of Executive Order 13582 and 31 C.F.R. § 542.405.

All in violation of 50 U.S.C. § 1705.

**COUNTS 4-11:**          **(18 U.S.C. § 554 – Smuggling)**

The Grand Jury charges that:

27.     The allegations contained in paragraphs 1-15 are hereby re-alleged and
incorporated by reference as if fully set forth herein.

28.     On or about the dates listed as to each count, in the District of Massachusetts and
elsewhere,

**ANTOINE AJAKA (1),**
**a/k/a TONY AJAKA,**
**ANNI BEURKLIAN (2),**
**a/k/a ANNI AJAKA,**
**TOP TECH US, INC. (3), and**
**AMIR KATRANJI (4),**
**a/k/a AMIR HACHEM KATRANJI,**
**a/k/a AMIR HACHEM ALKATRANJI,**
**a/k/a AMIR KATRA,**

defendants herein, did fraudulently and knowingly buy, sell, receive, and facilitate the

transportation, concealment, and sale of merchandise, articles, and objects described more fully

below, contrary to the laws and regulations of the United States; and did fraudulently and

knowingly export and send and cause to be exported and sent from the United States

merchandise, articles, and objects contrary to the laws and regulations of the United States, that

is, 50 U.S.C. § 1705, 15 C.F.R. §§ 736.2(b)(5), 758.1, 764.2, 744.16 & Supplement No. 4 (the

DOC Entity List), and Executive Orders 13222 and 13582:

| Count | Approximate Date of Purchase and Export | Item Description |
|:-:|:--|:--|
| 4 | February - March 2014 | Electronic testing equipment (Fluke Products) |
| 5 | May-June 2014 | 62 MTG12 Toggle Switches |
| 6 | May-July 2014 | 15 RCM4300 Core Programmable Modules |
| 7 | February-March 2015 | Electronic components and sound equipment |
| 8 | November 2015 | 900 Toggle Switches Model No. 8824K14 |
| 9 | June 2016 | 3D Printers and electronic components |
| 10 | August 2016 | 1,000 Toggle Switches (500 Model No. 8810K15 and 500 Model No. 8822K20) |
| 11 | November -December 2016 | Computers, computer equipment, and electronic components |

All in violation of 18 U.S.C. §§ 554 and 2.

<u>**COUNT 12:**</u>        **(18 U.S.C. § 371 – Conspiracy to Obstruct Justice)**

The Grand Jury charges that:

29.        The allegations contained in paragraphs 1-15 are hereby re-alleged and

incorporated by reference as if fully set forth herein.

30.        From a date unknown to the Grand Jury, but no later than in or about September

2016, and continuing thereafter until in or about May 2017, in the District of Massachusetts and

elsewhere,

**ANTOINE AJAKA (1),**
**a/k/a TONY AJAKA,**
**ANNI BEURKLIAN (2),**
**a/k/a ANNI AJAKA,**
**TOP TECH US, INC. (3), and**
**AMIR KATRANJI (4),**
**a/k/a AMIR HACHEM KATRANJI,**
**a/k/a AMIR HACHEM ALKATRANJI,**
**a/k/a AMIR KATRA,**

defendants herein, did knowingly conspire, combine, confederate and agree with one another,

and with others known and unknown to the grand jury, to commit an offense against the United

States, to wit, Obstruction of Justice, in violation of 18 U.S.C. § 1519, by agreeing to knowingly

alter, destroy, mutilate, conceal, cover up, falsify, and make a false entry in, a record and

document, with the intent to impede, obstruct, and influence an investigation and proper

administration of a matter within the jurisdiction of an agency of the United States Government,

and in relation to and contemplation of such investigation and matter.

OVERT ACTS

31.        In furtherance of the conspiracy, and to effect its objects, the defendants

committed overt acts, including, but not limited to, the following:

23

(a) After receiving a letter from CBP notifying TOP TECH US that 1,000 electronic switches it had attempted to ship to Hong Kong in September 2016 had been seized for undervaluing their value and failure to file the mandatory Electronic Export Information (EEI), BEURKLIAN and AJAKA discussed how to conceal their illegal activity.

(b) On or about November 15, 2016, BEURKLIAN sent an e-mail to KATRANJI attaching a falsified invoice purporting to show that TOP TECH US had charged one of KATRANJI'S front companies, Smart Logistic in Lebanon, $16,359.17 on November 12, 2015 for 900 electronic switches. BEURKLIAN told KATRANJI in her e-mail, "Tony will explain to you about his old invoice."

(c) On or about November 17, 2016, BEURKLIAN created documents using Microsoft Word that purported to be a series of e-mails that had been exchanged between TOP TECH US and KATRANJI, which falsely claimed that the 1,000 electronic switches CBP had detained were exported to KATRANJI for $1,000, more than $12,000 less than their actual value.

(d) On or about November 28, 2016, BEURKLIAN mailed a letter to U.S. Customs and Border Protection, which contained a false record of TOP TECH US's business transactions with KATRANJI. In her letter to CBP, BEURKLIAN contended that EEI related to the export of the electronic switches was not filed as a result of a "mistake" and that TOP TECH US was only paid $1,000 for these switches even though they were worth $13,910.40. BEURKLIAN also submitted falsified e-mail correspondence with her letter to CBP that she had created to support her claim that TOP TECH US's failure to submit EEI was an unintentional mistake.

(e) On or about November 29, 2016, BEURKLIAN sent KATRANJI an e-mail

24

containing the invoices and e-mail correspondence that she had submitted to CBP.

BEURKLIAN further instructed KATRANJI: "pls call me on what's app when you receive this email."

(f) On or about December 1, 2016, BEURKLIAN advised KATRANJI via Whatsapp that she sent the paperwork to the Government regarding the switches "to justify the situation as you know, like we agreed upon." BEURKLIAN further requested KATRANJI "to say the same thing" if "someone calls you ... so we don't find ourselves in trouble."

All in violation of 18 U.S.C. § 371.

**COUNT 13:**         **(18 U.S.C. § 1519 – Obstruction of Justice)**

The Grand Jury charges that:

32.     The allegations contained in paragraphs 1-15 are hereby re-alleged and

incorporated by reference as if fully set forth herein.

33.     From a date unknown to the Grand Jury, but no later than in or about September

2016, and continuing thereafter until in or about May 2017, in the District of Massachusetts and

elsewhere,

**ANTOINE AJAKA (1),**
**a/k/a TONY AJAKA,**
**ANNI BEURKLIAN (2),**
**a/k/a ANNI AJAKA,**
**TOP TECH US, INC. (3), and**
**AMIR KATRANJI (4),**
**a/k/a AMIR HACHEM KATRANJI,**
**a/k/a AMIR HACHEM ALKATRANJI,**
**a/k/a AMIR KATRA,**

defendants herein, did alter, destroy, mutilate, conceal, cover up, falsify, and make a false entry

in, a record and document, with the intent to impede, obstruct, and influence the investigation

and proper administration of a matter within the jurisdiction of an agency of the United States

Government, and in relation to and contemplation of such investigation and matter.

All in violation of 18 U.S.C. §§ 1519 and 2.

**COUNT 14:**     **(18 U.S.C. § 1341 – Mail Fraud)**

The Grand Jury charges that:

34.     The allegations contained in paragraphs 1-15 are hereby re-alleged and incorporated by reference as if fully set forth herein.

35.     From a date unknown to the Grand Jury, but no later than in or about November 2016, in the District of Massachusetts and elsewhere,

**ANTOINE AJAKA,**
**a/k/a TONY AJAKA; and**
**ANNI BEURKLIAN,**
**a/k/a ANNIE AJAKA;**

defendants herein, having devised and intending to devise a scheme and artifice to defraud and to obtain money and property by means of materially false and fraudulent pretenses, representation, and promises, for the purpose of executing such scheme and artifice and attempting to do so, placed and caused to be placed in a post office and authorized depository for mail matter, a matter and thing to be sent and delivered by the Postal Service, and knowingly caused a thing to be delivered by U.S. mail, to wit, a package addressed to U.S. Customs & Border Protection, JFK Airport, Building #77, Jamaica, NY 11430.

All in violation of 18 U.S.C. §§ 1341 and 2.

## FORFEITURE ALLEGATION
(18 .S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c))

36.     Upon conviction of Conspiracy, in violation of 50 U.S.C. § 1705, set forth in Count 1 of this Indictment, Illegal Provision of Services to Syria, in violation of 50 U.S.C. § 1705, set forth in Count 3 of this Indictment, Smuggling, in violation of 18 U.S.C. § 554, as set forth in Counts 4-11 of this Indictment, and Mail Fraud, in violation of 18 U.S.C. § 1341, set forth in Count 14 of this Indictment,

**ANTOINE AJAKA (1),
a/k/a TONY AJAKA,
ANNI BEURKLIAN (2),
a/k/a ANNI AJAKA,
TOP TECH US, INC. (3), and
AMIR KATRANJI (4),
a/k/a AMIR HACHEM KATRANJI,
a/k/a AMIR HACHEM ALKATRANJI,
a/k/a AMIR KATRA,**

defendants herein, shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c), any property, real or personal, which constitutes or is derived from proceeds traceable to the offenses.

37.     If any of the property described in Paragraph 36, above, as being forfeitable pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c), as a result of any act or omission of the defendants --

        (a)     cannot be located upon the exercise of due diligence;

        (b)     has been transferred or sold to, or deposited with, a third party;

        (c)     has been placed beyond the jurisdiction of the Court;

        (d)     has been substantially diminished in value; or

28

        (e)     has been commingled with other property which cannot be divided without difficulty;

it is the intention of the United States, pursuant to Title 28, United States Code, Section 2461(c),

incorporating Title 21, United States Code, Section 853(p), to seek forfeiture of any other

property of the defendants up to the value of the property described in Paragraph 34 above.

        All pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United

States Code, Section 2461(c).

29

A TRUE BILL

*Richard Healy*

FOREPERSON OF THE GRAND JURY


B. STEPHANIE SIEGMANN
Assistant United States Attorney


DISTRICT OF MASSACHUSETTS, Boston, MA          March 21, 2018


Returned into the District Court by the Grand Jurors and filed.


Deputy Clerk *Putnam*
HAROLD PUTNAM
3/21/18 @ 12:06 pm

30

**Criminal Case Cover Sheet**                          **U.S. District Court - District of Massachusetts**

| | | |
|---|---|---|
| **Place of Offense:** | **Category No.** ___II___ | **Investigating Agency** HSI, FBI, DOC, DCIS |

**City** ___Waltham and Elsewhere___     **Related Case Information:**

18 CR 10069 - 1

**County** ___Middlesex___

Superseding Ind./ Inf. _____     Case No.
Same Defendant _____     New Defendant ___X___
Magistrate Judge Case Number _____
Search Warrant Case Number   17-2179-MBB, 17-2180-MBB
R 20/R 40 from District of _____

**Defendant Information:**

Defendant Name   ANTOINE AJAKA                    Juvenile:      ☐ Yes  ☑ No

Is this person an attorney and/or a member of any state/federal bar:      ☐ Yes  ☑ No

Alias Name     TONY AJAKA

Address     (City & State)  Waltham, Massachusetts & Lebanon

Birth date (Yr only): 1968   SSN (last4#): 1774   Sex M     Race: White     Nationality: Lebanese

**Defense Counsel if known:**     Brad Bailey, Esq.          Address 44 School Street, Suite 1000B, Boston, MA

**Bar Number** _____

**U.S. Attorney Information:**

**AUSA**   B, Stephanie Siegmann          Bar Number if applicable   638257

**Interpreter:**      ☐ Yes  ☑ No          List language and/or dialect: _____

**Victims:**      ☐ Yes ☑ No  If yes, are there multiple crime victims under 18 USC§3771(d)(2)    ☐ Yes  ☐ No

**Matter to be SEALED:**      ☐ Yes  ☑ No

☑ Warrant Requested          ☐ Regular Process          ☐ In Custody

**Location Status:**

**Arrest Date** _____

☐ Already in Federal Custody as of _____ in _____ .
☐ Already in State Custody at _____  ☐ Serving Sentence   ☐ Awaiting Trial
☐ On Pretrial Release:   Ordered by: _____ on _____

**Charging Document:**      ☐ Complaint      ☐ Information      ☑ Indictment

**Total # of Counts:**      ☐ Petty ——      ☐ Misdemeanor ——      ☑ Felony   14

Continue on Page 2 for Entry of U.S.C. Citations

☑ **I hereby certify that the case numbers of any prior proceedings before a Magistrate Judge are accurately set forth above.**

Date:   March 21, 2018          Signature of AUSA: _____

JS 45 (5/97)  (Revised U.S.D.C. MA 12/7/05) Page 2 of 2 or Reverse

**District Court Case Number**  (To be filled in by deputy clerk): _____

**Name of Defendant**    ANTOINE AJAKA a/k/a TONY AJAKA

### U.S.C. Citations

| | **Index Key/Code** | **Description of Offense Charged** | **Count Numbers** |
|---|---|---|---|
| Set 1 | 50 U.S.C. § 1705 | Conspiracy to Commit Export Violations | 1 |
| Set 2 | 18 U.S.C. § 371 | Conspiracy to Defraud the United States | 2 |
| Set 3 | 50 U.S.C. § 1705 | Illegal Provision of Services to Syria | 3 |
| Set 4 | 18 U.S.C. § 554 | Smuggling | 4-11 |
| Set 5 | 18 U.S.C. § 371 | Conspiracy to Obstruct Justice | 12 |
| Set 6 | 18 U.S.C. § 1519 | Obstruction of Justice | 13 |
| Set 7 | 18 U.S.C. § 1341 | Mail Fraud | 14 |
| Set 8 | | | |
| Set 9 | | | |
| Set 10 | | | |
| Set 11 | | | |
| Set 12 | | | |
| Set 13 | | | |
| Set 14 | | | |
| Set 15 | | | |

**ADDITIONAL INFORMATION:** _____

**Criminal Case Cover Sheet**                    **U.S. District Court - District of Massachusetts**

| | | |
|---|---|---|
| **Place of Offense:** | **Category No.** II | **Investigating Agency** HSI, FBI, DOC, DCIS |

**City** Waltham and Elsewhere           **Related Case Information:**

18 CR 10069

**County** Middlesex

Superseding Ind./ Inf. _____     Case No.
Same Defendant _____ New Defendant X
Magistrate Judge Case Number _____
Search Warrant Case Number  17-2179-MBB, 17-2180-MBB
R 20/R 40 from District of _____

**Defendant Information:**

Defendant Name   ANNI BEURKLIAN                    Juvenile:    ☐ Yes  ☑ No

Is this person an attorney and/or a member of any state/federal bar:    ☐ Yes  ☑ No

Alias Name   ANNI AJAKA

Address   (City & State)  Waltham, Massachusetts & Lebanon

Birth date (Yr only): 1969   SSN (last4#): 2467   Sex F   Race: White   Nationality: US & Lebanese

**Defense Counsel if known:**   Brad Bailey, Esq.          Address 44 School Street, Suite 1000B, Boston, MA

**Bar Number** _____

**U.S. Attorney Information:**

**AUSA**   B, Stephanie Siegmann                    Bar Number if applicable   638257

**Interpreter:**    ☐ Yes  ☑ No          List language and/or dialect: _____

**Victims:**    ☐ Yes ☑ No  If yes, are there multiple crime victims under 18 USC§3771(d)(2)   ☐ Yes  ☐ No

**Matter to be SEALED:**    ☐ Yes  ☑ No

☑ Warrant Requested          ☐ Regular Process          ☐ In Custody

**Location Status:**

**Arrest Date** _____

☐ Already in Federal Custody as of _____ in _____ .
☐ Already in State Custody at _____ ☐ Serving Sentence   ☐ Awaiting Trial
☐ On Pretrial Release:   Ordered by: _____ on _____

**Charging Document:**    ☐ Complaint    ☐ Information    ☑ Indictment

**Total # of Counts:**    ☐ Petty _____    ☐ Misdemeanor _____    ☑ Felony  14

Continue on Page 2 for Entry of U.S.C. Citations

☑  I hereby certify that the case numbers of any prior proceedings before a Magistrate Judge are accurately set forth above.

Date:   March 21, 2018          Signature of AUSA:

**District Court Case Number** (To be filled in by deputy clerk): _____

**Name of Defendant**    ANNI BEURKLIAN a/k/a ANNI AJAKA

## U.S.C. Citations

| Index Key/Code | Description of Offense Charged | Count Numbers |
|---|---|---|
| Set 1   50 U.S.C. § 1705 | Conspiracy to Commit Export Violations | 1 |
| Set 2   18 U.S.C. § 371 | Conspiracy to Defraud the United States | 2 |
| Set 3   50 U.S.C. § 1705 | Illegal Provision of Services to Syria | 3 |
| Set 4   18 U.S.C. § 554 | Smuggling | 4-11 |
| Set 5   18 U.S.C. § 371 | Conspiracy to Obstruct Justice | 12 |
| Set 6   18 U.S.C. § 1519 | Obstruction of Justice | 13 |
| Set 7   18 U.S.C. § 1341 | Mail Fraud | 14 |
| Set 8 | | |
| Set 9 | | |
| Set 10 | | |
| Set 11 | | |
| Set 12 | | |
| Set 13 | | |
| Set 14 | | |
| Set 15 | | |

**ADDITIONAL INFORMATION:** _____

**Criminal Case Cover Sheet**                    **U.S. District Court - District of Massachusetts**

**Place of Offense:**          **Category No.**  II          **Investigating Agency**  HSI, FBI, DOC, DCIS

**City**  Waltham and Elsewhere          **Related Case Information:**          18CR10069-3

**County**  Middlesex          Superseding Ind./ Inf. _____  Case No.
Same Defendant _____  New Defendant  X
Magistrate Judge Case Number _____
Search Warrant Case Number  17-2179-MBB, 17-2180-MBB
R 20/R 40 from District of _____

**Defendant Information:**

Defendant Name  TOP TECH US, Inc.          Juvenile:          ☐ Yes  ☑ No

Is this person an attorney and/or a member of any state/federal bar:          ☐ Yes  ☑ No

Alias Name _____

Address          (City & State)  Waltham, Massachusetts

Birth date (Yr only): _____  SSN (last4#): _____  Sex _____  Race: _____  Nationality: _____

**Defense Counsel if known:**          Brad Bailey, Esq.          Address  44 School Street, Suite 1000B, Boston, MA

**Bar Number** _____

**U.S. Attorney Information:**

**AUSA**  B, Stephanie Siegmann          Bar Number if applicable  638257

**Interpreter:**  ☐ Yes  ☑ No          List language and/or dialect: _____

**Victims:**  ☐ Yes ☑ No  If yes, are there multiple crime victims under 18 USC§3771(d)(2)  ☐ Yes  ☐ No

**Matter to be SEALED:**  ☐ Yes  ☑ No

☐ Warrant Requested          ☐ Regular Process          ☐ In Custody

**Location Status:**

**Arrest Date** _____

☐ Already in Federal Custody as of _____ in _____ .
☐ Already in State Custody at _____  ☐ Serving Sentence  ☐ Awaiting Trial
☐ On Pretrial Release:  Ordered by: _____ on _____

**Charging Document:**  ☐ Complaint          ☐ Information          ☑ Indictment

**Total # of Counts:**  ☐ Petty _____  ☐ Misdemeanor _____  ☑ Felony  13

Continue on Page 2 for Entry of U.S.C. Citations

☑  I hereby certify that the case numbers of any prior proceedings before a Magistrate Judge are accurately set forth above.

Date:  March 21, 2018          Signature of AUSA:

JS 45 (5/97)   (Revised U.S.D.C. MA 12/7/05) Page 2 of 2 or Reverse

**District Court Case Number**   (To be filled in by deputy clerk): _____

**Name of Defendant**   TOP TECH US, Inc. _____

## U.S.C. Citations

| | Index Key/Code | Description of Offense Charged | Count Numbers |
|---|---|---|---|
| Set 1 | 50 U.S.C. § 1705 | Conspiracy to Commit Export Violations | 1 |
| Set 2 | 18 U.S.C. § 371 | Conspiracy to Defraud the United States | 2 |
| Set 3 | 50 U.S.C. § 1705 | Illegal Provision of Services to Syria | 3 |
| Set 4 | 18 U.S.C. § 554 | Smuggling | 4-11 |
| Set 5 | 18 U.S.C. § 371 | Conspiracy to Obstruct Justice | 12 |
| Set 6 | 18 U.S.C. § 1519 | Obstruction of Justice | 13 |
| Set 7 | | | |
| Set 8 | | | |
| Set 9 | | | |
| Set 10 | | | |
| Set 11 | | | |
| Set 12 | | | |
| Set 13 | | | |
| Set 14 | | | |
| Set 15 | | | |

**ADDITIONAL INFORMATION:** _____

_____

_____

_____

**Criminal Case Cover Sheet**                                    **U.S. District Court - District of Massachusetts**

| | | |
|---|---|---|
| **Place of Offense:** | **Category No.** ___II___ | **Investigating Agency** HSI, FBI, DOC, DCIS |

**City** __Waltham and Elsewhere__          **Related Case Information:**       18CR 10069_4

**County** __Middlesex__

Superseding Ind./ Inf. _____          Case No. _____
Same Defendant _____          New Defendant __X__
Magistrate Judge Case Number _____
Search Warrant Case Number __17-2179-MBB, 17-2180-MBB__
R 20/R 40 from District of _____

**Defendant Information:**

Defendant Name __AMIR KATRANJI__                    Juvenile:     ☐ Yes  ☑ No

Is this person an attorney and/or a member of any state/federal bar:     ☐ Yes  ☑ No

Alias Name __Amir Hachem Katranji, Amir Hachem Alkatranji, and Amir Katra__

Address __(City & State)  Syria__

Birth date (Yr only): __1966__  SSN (last4#): _____  Sex __M__     Race: __White__     Nationality: __Syrian__

**Defense Counsel if known:** _____          Address _____

**Bar Number** _____

**U.S. Attorney Information:**

**AUSA** __B, Stephanie Siegmann__                    Bar Number if applicable __638257__

**Interpreter:**     ☐ Yes  ☑ No          List language and/or dialect: _____

**Victims:**     ☐ Yes ☑ No  If yes, are there multiple crime victims under 18 USC§3771(d)(2)     ☐ Yes  ☐ No

**Matter to be SEALED:**     ☐ Yes  ☑ No

☑ Warrant Requested          ☐ Regular Process          ☐ In Custody

**Location Status:**

**Arrest Date** _____

☐ Already in Federal Custody as of _____ in _____ .
☐ Already in State Custody at _____ ☐ Serving Sentence     ☐ Awaiting Trial
☐ On Pretrial Release:     Ordered by: _____ on _____

**Charging Document:**     ☐ Complaint          ☐ Information          ☑ Indictment

**Total # of Counts:**     ☐ Petty _____          ☐ Misdemeanor _____          ☑ Felony __12__

Continue on Page 2 for Entry of U.S.C. Citations

☑ **I hereby certify that the case numbers of any prior proceedings before a Magistrate Judge are accurately set forth above.**

Date: __March 21, 2018__          Signature of AUSA: _____

**District Court Case Number**  (To be filled in by deputy clerk): _____

**Name of Defendant**     Amir Katranji _____

### U.S.C. Citations

| | Index Key/Code | Description of Offense Charged | Count Numbers |
|---|---|---|---|
| Set 1 | 50 U.S.C. § 1705 | Conspiracy to Commit Export Violations | 1 |
| Set 2 | 18 U.S.C. § 371 | Conspiracy to Defraud the United States | 2 |
| Set 3 | 18 U.S.C. § 554 | Smuggling | 4-11 |
| Set 4 | 18 U.S.C. § 371 | Conspiracy to Obstruct Justice | 12 |
| Set 5 | 18 U.S.C. § 1519 | Obstruction of Justice | 13 |
| Set 6 | | | |
| Set 7 | | | |
| Set 8 | | | |
| Set 9 | | | |
| Set 10 | | | |
| Set 11 | | | |
| Set 12 | | | |
| Set 13 | | | |
| Set 14 | | | |
| Set 15 | | | |

**ADDITIONAL INFORMATION:** _____

_____

_____

_____